UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MOSAIC HEALTH INC., and CENTRAL
VIRGINIA HEALTH SERVICES, INC.,
*individually and on behalf of all those*
*similarly situated*,

                    Plaintiffs,

          v.

SANOFI-AVENTIS U.S., LLC, ELI LILLY
AND COMPANY, LILLY USA, LLC,
NOVO NORDISK INC., and
ASTRAZENECA PHARMACEUTICALS
LP,

                    Defendants.
_____

**DECISION AND ORDER**

6:21-CV-06507 EAW

## **INTRODUCTION**

Plaintiffs Mosaic Health, Inc. ("Mosaic Health") and Central Virginia Health Services, Inc. ("CVHS") (collectively "Plaintiffs") allege that defendant pharmaceutical companies Sanofi-Aventis U.S. ("Sanofi"), Eli Lilly and Company and Lilly USA, LLC ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and AstraZeneca Pharmaceuticals LP ("AstraZeneca") (collectively "Defendants") have violated state and federal antitrust laws by coordinating to rescind a long-standing discount for "safety-net" hospitals and clinics that treat patients who would otherwise be unable to obtain care. (Dkt. 1). Presently before

the Court is a joint motion to dismiss filed by Defendants.  (Dkt. 47; Dkt. 48)[1].  For the reasons that follow, the Court grants Defendants' motion, but conditionally grants Plaintiffs' request for leave to file a second amended complaint.

## BACKGROUND

### I.   Factual Background

The instant facts are taken from Plaintiffs' amended complaint, which is the operative pleading.  As is required at this stage of the proceedings, Plaintiffs' factual allegations are taken as true.

Mosaic Health is a nonprofit healthcare organization with its principal place of business in Rochester, New York.  (Dkt. 41 at ¶ 9).  It is "a federally qualified health center that receives funds from the U.S. Department of Health and Human Services, Health Resources and Services Administration to provide healthcare services to people residing in medically underserved areas, regardless of their ability to pay" and operates 22 safety-net clinics.  (*Id*.).  CVHS is a nonprofit healthcare organization with its principal place of business in New Canton, Virginia.  (*Id*. at ¶ 10).  It is "a federally qualified health center that receives funds from the U.S. Department of Health and Human Services, Health Resources and Services Administration to provide healthcare services to people residing in medically underserved areas, regardless of their ability to pay" and operates 18 safety-net clinics.  (*Id*.).

---

[1]     Defendants have also filed a motion to stay discovery pending resolution of the motion to dismiss.  (Dkt. 51).  In light of the Court's resolution of the motion to dismiss, the motion to stay is denied as moot.

In 1992, Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, created the "340B Drug Discount Program," which "require[s] discounts on outpatient drugs purchased by healthcare providers serving underserved populations." (*Id*. at ¶ 21). "The net savings and revenue generated through access to 340B Drug Discounts [are] sometimes referred to as 340B Savings" and "340B Savings are often a critical component of covered entities' ability to provide healthcare services to patients." (*Id*. at ¶¶ 23-24). Mosaic Health, for example, uses 340B savings to "help fund sliding fee discounted medications for patients in need." (*Id*. at ¶ 25).

"Since its inception, the 340B Drug Discount has been a defined discount, specific to each drug, calculated by the 340B Drug Discount Program." (*Id*. at ¶ 29). More specifically, Section 340B imposes a ceiling price for a drug, which is "generally equal to the 'Average Manufacturer Price' minus a 'Unit Rebate Amount.'" (*Id*. at ¶ 30). Pharmaceutical companies report their 340B ceiling prices to the Health Resources and Services Administration ("HRSA") on a quarterly basis, and the HRSA in turn makes those prices available to covered entities via its 340B Office of Pharmacy Affairs Information System ("340B OPAIS"), "an online database that allows covered entities to access ceiling prices for covered outpatient drugs." (*Id*. at ¶ 31).

"Since at least 1996, and in greater volumes since 2010, all drug companies participating in the 340B Drug Discount Program have offered Contract Pharmacy 340B Drug Discounts to covered entities. To do so, drug companies have offered covered entities the 340B Drug Discount on covered outpatient drugs purchased on the covered entities' own accounts but shipped to their registered Contract Pharmacy sites." (*Id*. at ¶ 55). A

typical arrangement involving a contract pharmacy would work as follows: (1) a covered entity's patient arrives at a contract pharmacy for a covered outpatient drug; (2) the contract pharmacy, "sometimes itself and sometimes working with a 340B vendor . . . reviews the pharmacy prescription to identify the patient's prescription as 340B eligible and to match it to a particular covered entity"; (3) the contract pharmacy fills the prescription with inventory from the purchasing account of the covered entity; (4) the contract pharmacy charges the patient for any required co-pay or fee, "adjusted downward as appropriate by any sliding-fee scale arrangement between the pharmacy and the covered entity"; (5) the contract pharmacy collects reimbursements from any third-parties such as private insurers or Medicare Part D; and (6) the contract pharmacy remits any amounts collected to the covered entity and the covered entity pays the contract pharmacy a dispensing fee. (*Id*. at ¶ 56).

Diabetes "is often coincident with low-income populations and in lower-income neighborhoods that are underserved by private healthcare practices" and is "a common area of treatment for 340B covered entity hospitals and clinics." (*Id*. at ¶¶ 72-73). "Consequently, diabetes medications make up a significant portion of 340B covered entities' outpatient prescriptions and 340B Drug Discounts. And three of the most significant diabetes medications are rapid-acting analog insulins, long-acting analog insulins, and incretin mimetics." (*Id*. at ¶ 74).

The defendant pharmaceutical companies "dominate three of today's most lucrative markets for diabetes treatments: (i) rapid-acting analog insulins; (ii) long-acting analog insulins; and (iii) incretin mimetics. Defendants compete against each other, as horizontal

competitors, in these markets." (*Id*. at ¶ 68). Sanofi, Eli Lilly, and Novo Nordisk compete in the sale of rapid-acting analog insulins and long-acting analog insulins. (*Id*. at ¶¶ 75-84). Sanofi, Eli Lilly, Novo Nordisk, and AstraZeneca compete in the sale of incretin mimetics. (*Id*. at ¶¶ 85-90). These products collectively represent "hundreds of millions or billions of dollars in annual sales for each company." (*Id*. at ¶ 91).

In 2020, Defendants spent millions of dollars "collectively lobbying the federal government . . . to limit 340B Drug Discounts with respect to diabetes medicines." (*Id*. at ¶ 100). However, those efforts were largely unsuccessful. (*Id*. at ¶¶ 100-116). On July 24, 2020, then-President Donald Trump issued Executive Order 13937, which "addressed the use of insulin (as well as epinephrine) within the 340B Drug Discount Program," but was "extremely limited in scope." (*Id*. at ¶¶ 102-103). "Executive Order 13937 promised to have relatively little impact on the volume of 340B Drug Discounts for insulin medications[.]" (*Id*. at ¶ 104).

On July 24, 2020, AstraZeneca advised the United States Department of Health and Human Services ("HHS") that it intended to limit contract pharmacy 340B drug discounts. (*Id*. at ¶ 118). More particularly, AstraZeneca stated that beginning October 1, 2020, and for certain of its products, it would "recognize one contract pharmacy per covered entity for those covered entities that do not maintain an on-site dispensing pharmacy." (*Id*.).

On or about July 27, 2020, Sanofi informed all 340B Drug Discount Program covered entities that it would be implementing a new initiative that would "cut off all Contract Pharmacy 340B Drug Discounts, which had been in place for a decade, unless covered entities provided new consideration to Sanofi." (*Id*. at ¶ 120). "The newly

required consideration was entry into a contract to provide sensitive prescription claims data to a Sanofi vendor through a software portal on commercially unreasonable terms." (*Id*.).  Sanofi announced that its new policy would take effect on October 1, 2020.  (*Id*.).

On August 19, 2020, Eli Lilly advised HHS that effective September 1, 2020, it would discontinue voluntarily honoring requests for 340B contract pharmacies except "primarily" where a covered entity did not have an in-house pharmacy.  (*Id*.).  Eli Lilly also "added a special exception to permit Contract Pharmacies to pass along certain insulin products at cost," but "that exception was infeasible for covered entities and pharmacies, as it required the Contract Pharmacies to fill prescriptions without any fee whatsoever." (*Id*. at ¶ 122).

On December 1, 2020, Novo Nordisk advised HHS that "it would stop offering Contract Pharmacy 340B Drug Discounts to all hospital covered entities" effective January 1, 2021.  (*Id*. at ¶ 124).

## II.   **Procedural Background**

Mosaic Health commenced this putative class action on July 30, 2021.  (Dkt. 1). The amended complaint, which added CVHS as a plaintiff, was filed on October 22, 2021. (Dkt. 41).  Defendants filed their joint motion to dismiss the amended complaint on November 12, 2021.  (Dkt. 47; Dkt. 48).

Defendants filed their joint motion to stay discovery pending resolution of the motion to dismiss on November 24, 2021.  (Dkt. 51).  Plaintiffs opposed this motion on December 20, 2021 (Dkt. 53), and Defendants filed a reply on December 27, 2021 (Dkt. 54).

Plaintiffs filed their opposition to the motion to dismiss on January 7, 2022.  (Dkt. 58; Dkt. 59).  Replies were filed on February 4, 2022.  (Dkt. 66; Dkt. 67).

## DISCUSSION

### I.  Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Nielsen*

*v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II.   <u>Plaintiffs' Claims</u>

The amended complaint sets forth the following claims:  (1) violations of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) "unreasonable restraint of trade" in violation of the laws of Arizona, California, Connecticut, the District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin; and (3) unjust enrichment under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Delaware, Florida, Georgia, Hawaii, Indiana, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.  (Dkt. 41 at ¶¶ 255-279).  Plaintiffs seek both damages and injunctive relief with respect to their Sherman Act claim.  (*Id*. at ¶¶ 262-65).

Defendants seek dismissal of all of Plaintiffs' claims, arguing that: (1) Plaintiffs lack standing to sue for damages under federal antitrust law pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), because they are indirect purchasers of Defendants' drugs; (2) Plaintiffs have failed to plausibly allege an agreement among Defendants; (3) Plaintiffs' true claim "stems from their dissatisfaction with the terms on which contract pharmacies

may access each Defendant's 340B drugs," but there is no private right of action under Section 340B; and (4) Plaintiffs' state-law claims are deficiently pled for numerous reasons. (Dkt. 47-1 at 13-14). For the reasons set forth below, the Court agrees with Defendants that Plaintiffs have failed to plausibly allege an agreement among Defendants and that the federal and state antitrust claims accordingly fail.[2] The Court further agrees that Defendants have not complied with the applicable pleading standards with respect to their unjust enrichment claims.

### A.  Sherman Act § 1 Claim

"Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a 'contract, combination . . ., or conspiracy, in restraint of trade or commerce.'" *Twombly*, 550 U.S. at 548 (quoting 15 U.S.C. § 1). "Because § 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id.* at 553 (alterations in original) (quotations and citation omitted). "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.

---

[2]     The Court notes that "the *Illinois Brick* doctrine is not jurisdictional," *Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709, 710 (7th Cir. 2022), and that it accordingly is not constrained to reach this issue first.

"The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation." *Mayor and City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013). "[A] plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.* at 136. "[A] complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* (emphasis in original). "[A] horizontal agreement . . . may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* (quotation omitted). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (quotation and footnote omitted).

"Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57. In other words, allegations of parallel action "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* As the Second Circuit has explained:

> Examples of parallel conduct allegations that might be sufficient under *Twombly*'s standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "complex and historically unprecedented changes in pricing

structure made at the very same time by multiple competitors, and made for
no other discernible reason."

*Citigroup*, 709 F.3d at 137 (quoting *Twombly*, 550 U.S. at 556 n.4 (quotation omitted)).

Plaintiffs do not contend to have alleged direct evidence of a conspiracy in this case.
(*See* Dkt. 58 at 34).  Instead, they argue that they have plausibly alleged that Defendants
engaged in parallel conduct in a context suggesting collusion.  However, the Court agrees
with Defendants that Plaintiffs have not plausibly alleged parallel conduct for the reasons
that follow.

"'Parallel conduct' refers to the same or substantially similar actions taken by actors
on the same level."  *North Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*, 296 F. Supp.
3d 442, 460 n.26 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018).  Conduct need not be
completely uniform in order to qualify as parallel.  *See, e.g., In re Int. Rate Swaps Antitrust
Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017); *In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 722, 792 (N.D. Ill. 2017).  However, where the alleged conspirators
engaged in different conduct at different times, a plaintiff's "allegations fall far short of
demonstrating parallel behavior[.]"  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d
Cir. 2011).

In this case, Plaintiffs' own allegations make clear that Defendants adopted four
distinct policies regarding contract pharmacies and 340B drug discounts over the course of
several months in mid-to-late 2020.  More particularly, in late July of 2020, AstraZeneca
determined that as of October 1, 2020, and for certain of its products, it would only
recognize one contract pharmacy per covered entity for covered entities without on-site

pharmacies. (Dkt. 41 at ¶ 118). Shortly thereafter, Sanofi announced that as of October 1, 2020, it would continue to allow covered entities to utilize unlimited contract pharmacies, so long as those covered entities agreed to provide certain prescription claims data. (*Id*. at ¶ 120).[3] Then, roughly three weeks later, in mid-August of 2020, Eli Lilly announced that as of September 1, 2020, it would cease recognizing contract pharmacy requests unless a covered entity did not have an in-house pharmacy, but that it would allow contract pharmacies to pass along certain insulin products at cost if those contract pharmacies did not charge a fee. (*Id*. at ¶¶ 121-22).[4] Finally, on December 1, 2020, Novo Nordisk announced that it would "stop offering Contract Pharmacy 340B Drug Discounts to hospital covered entities" effective January 1, 2021. (*Id*. at ¶ 124 (emphasis added)). To summarize: AstraZeneca limited contract pharmacy 340B drug discounts for certain drugs to a single contract pharmacy and only where the covered entity lacked an on-site pharmacy; Sanofi limited contract pharmacy 340B drug discounts to covered entities that agreed to comply with its new reporting requirements; Eli Lilly largely limited contract

---

[3]    Plaintiffs make the entirely conclusory allegation that the new reporting requirement imposed by Sanofi was "commercially unreasonable." (Dkt. 41 at ¶ 120). However, they have provided no support for that assertion, and this Court is not required to credit "mere conclusory statements" on a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 678.

[4]    Plaintiffs contend that this exception was "commercially infeasible," but their explanation for why that is allegedly so is difficult to understand. (Dkt. 41 at ¶ 123). Plaintiffs note that the exception requires the contract pharmacy to dispense the products without charging a dispensing fee, but then states that the exception was "virtually meaningless" because it "prevented the collection of any revenue by a covered entity to offset the dispensing fee the covered entity would have to pay the Contract Pharmacy." (*Id*.). It is unclear how the covered entity could be required to pay the contract pharmacy a dispensing fee when the exception prohibits the contract pharmacy from charging a dispensing fee.

pharmacy 340B drug discounts to covered entities without on-site pharmacies but also included a further exception for certain insulin products;[5] and Novo Nordisk limited contract pharmacy 340B drug discounts to non-hospital covered entities.

There is no plausible argument that these disparate policies are "substantially similar" so as to constitute parallel conduct for purposes of federal antitrust law. They are different in their particulars, their timing, and their outcomes. The Court finds instructive the Eighth Circuit's decision in *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018). There, the plaintiff claimed that the defendants had unlawfully conspired "to boycott independent mail-order pharmacies." *Id*. at 516. The Eighth Circuit found that the plaintiff had failed to plausibly plead parallel conduct, because while it "claim[ed] that CVS and Express Scripts conspired to terminate [it] from their . . . networks because it operated a mail-order pharmacy that competed with Express Scripts' and CVS's mail-order pharmacies," CVS's and Express Scripts' conduct was insufficiently similar. *Id*. In particular, CVS required the plaintiff to participate in its network three-months after Express Scripts "sent [the plaintiff] a letter demanding that [the plaintiff] abandon its mail-order pharmacy operations," and Express Scripts ultimately

---

[5]     In their opposition papers, Plaintiffs cite to paragraph 121 of the amended complaint to assert that "Eli Lilly stopped shipping 340B-discounted drugs to Contract Pharmacies beginning on September 1, 2020, with a claimed single-pharmacy exception where a covered entity does not have an in-house pharmacy." (Dkt. 58 at ¶ 22). However, paragraph 121 of the amended complaint makes no mention of a limitation to a single pharmacy. Further, a review of the actual letter that Eli Lilly sent to HHS—which Plaintiff references and quotes from in the amended complaint—shows that no such single-pharmacy limitation is set forth therein. (*See* Dkt. 47-4 at 2-4). Defendants confirm that Eli Lilly's policy "allows unlimited contract pharmacies if certain requirements are met." (Dkt. 66 at 18).

terminated Plaintiff from its network six months before CVS did. *Id*. at 516 -517. The dissimilarities in conduct, coupled with the temporal differences, "did not constitute parallel conduct." *Id*. at 517; *Cf. Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) (explaining that while the plaintiff had survived at the motion to dismiss stage by alleging that "all of the publisher and distributor defendants ceased doing business with [it] within a span of three business days," the evidence at the summary judgment stage conclusively showed that "defendants' conduct was not, in fact, parallel," because "defendants' responses were not uniform" and the "tight timeframe for those responses . . . was of [the plaintiff's] own making" (originally alterations omitted)).

The cases relied on by Plaintiffs are inapposite. An examination of one such case, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015), demonstrates why. There, the plaintiff alleged a group boycott, "which generally constitutes a concerted refusal by traders to deal with other traders." *Id.* at 426 (alteration and quotation omitted). The Fourth Circuit found that the plaintiff had "adequately alleged parallel conduct" because it had pled facts "indicating that the defendants acted 'similarly.'" *Id*. at 427 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1243 (3d Cir. 1993)). The *SD3* court rejected the defendants' argument "that their conduct must be deemed dissimilar at this stage because some licensing negotiations continued after the conspiracy formed," explaining that while the defendants were alleged to have "employed different courses of action" to achieve the same end result, "none of the defendants ultimately took a license or otherwise implemented [the plaintiff's] technology." *Id*. In other words, the defendants might have used slightly different methods, but they all arrived

at the same ultimate outcome. *See also In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d at 479 (in group boycott context, although actions were not uniform, every defendant allegedly ultimately aligned and refused to "make markets"); *In re Broiler Chicken*, 290 F. Supp. 3d at 792 (while the defendants' conduct was not entirely uniform, the plaintiffs "alleged that all of the defendants engaged in production cuts at the same time," thus achieving the end result of cutting the relevant industry's production below its "historic annual 3% production increase"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) (while Defendants "did not reduce or limit capacity in identical amounts," they all took steps that limited capacity growth).

By contrast, in this case, Plaintiffs have not plausibly alleged that Defendants' disparate conduct ultimately achieved the same or a substantially similar end result. While they have alleged in an entirely conclusory fashion that the "net effect" of each of the policies was to "end[] nearly all Contract Pharmacy 340B Drug Discounts for AstraZeneca, Eli Lilly, Novo Nordisk, and Sanofi drugs" (Dkt. 41 at ¶ 181), they have not supported that conclusion with any facts. To the contrary, the facts that are alleged in the amended complaint do not support this conclusion. It is undisputed that Novo Nordisk's new policy does not apply to the clinics operated by Plaintiffs. (*See* Dkt. 58 at 52). Further, Eli Lilly's new policy contains an exception for covered entities without an in-house pharmacy, and Plaintiffs affirmatively allege that "only a very small number" of covered entities use in-house pharmacies. (Dkt. 41 at ¶¶ 43-44, 46, 121). AstraZeneca's policy applies only to particular AstraZeneca products (*id*. at ¶ 118) and Plaintiffs have not alleged any information regarding what percentage of AstraZeneca's portfolio is subject thereto.

Finally, the amended complaint contains no factual allegations regarding the number or percentage of covered entities that have declined to participate in Sanofi's data reporting requirements.  The lack of information regarding the impact of Sanofi's policy is particularly problematic, inasmuch as this policy on its face does not limit the number of covered entities that can access contract pharmacy 340B drug discounts.

In sum, the amended complaint contains no facts from which it can plausibly be concluded that Defendants' disparate policies, which were adopted over the course of several months, had the same or even similar impacts on the availability of contract pharmacy 340B drug discounts to covered entities.  The adoption of those policies accordingly does not constitute parallel conduct as alleged.

Defendants and Plaintiffs also strenuously dispute whether Plaintiffs have plausibly alleged the presence of plus factors in this case.  However, "plus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement." *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/LIB), 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) (dismissing antitrust claims because "[w]hile Plaintiffs' cited plus factors are strong, the allegations at this point regarding parallel conduct are sparse and conclusory"); *see also Park Irmat*, 911 F.3d at 517 ("Because [the plaintiff] fails to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary."). Accordingly, the Court need not and does not reach these additional arguments at this time.

### B.    State Antitrust Claims

As set forth above, Plaintiffs have asserted claims under the antitrust laws of 25 states and the District of Columbia.  (Dkt. 41 at ¶ 266-72).  Defendants argue, and Plaintiffs

do not dispute, that "each of the relevant state statutes requires plausible allegations of a conspiracy to restrain trade[.]"  (Dkt. 47-1 at 51; *see also* Dkt. 41 at ¶ 267 (asserting that Defendants violated the state antitrust laws because they "entered into, established, and maintained a continuing contract, combination, or conspiracy in unreasonable restraint of trade.").  Plaintiffs' state antitrust claims thus fail for the same reason as their Sherman Act § 1 claim—they have not plausibly alleged the existence of a conspiracy.

### C.    <u>State Unjust Enrichment Claims</u>

Plaintiffs have asserted unjust enrichment claims under the laws of 47 states and the District of Columbia.  (Dkt. 41 at ¶¶ 273-79).  The Court agrees with Defendants that these unjust enrichment claims are inadequately pled.  This Court has previously held that the sort of "generic pleading" engaged in by Plaintiffs in this case—whereby they "pleaded federal antitrust claims and the factual foundation for them, and then merely alleged that those claims are also actionable as unjust enrichment" does "not comply with the relevant pleading standards."  *Miami Prod. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 247 (W.D.N.Y. 2021) (citation and original alterations omitted).

Plaintiffs' attempts to distinguish this case from *Miami Products* are unavailing. Plaintiffs claim that they "allege the specific elements required by each state" (Dkt. 58 at 60 (quotation omitted)), but they do not do so in any meaningful way.  Instead, they merely recite the elements for each state claim, with no elaboration.  (Dkt. 41 at ¶ 275).  As the Court explained in *Miami Products*, Plaintiffs "cannot simply enumerate a long list of state-law claims for states where they might otherwise have no available antitrust recovery and rely on the defendants and the court to sort out whether or how those laws can act as

surrogates for antitrust law."  546 F. Supp. 3d at 247.  Plaintiffs' unjust enrichment claims are accordingly subject to dismissal.

## III.  Leave to Amend

In their opposition papers, Plaintiffs state as follows: "To the extent the Court concludes that any claim or remedy is insufficiently pled, Plaintiffs respectfully request an opportunity to amend and replead." (Dkt. 58 at 65).  This "is not a proper motion for leave to amend, and fails to comply with the Local Rules of Civil Procedure with respect to the process for seeking to amend a pleading." *Wi3, Inc. v. Actiontec Elecs., Inc.*, 71 F. Supp. 3d 358, 363 (W.D.N.Y. 2014) (explaining that, among other things, this District's Local Rules require the party seeking to amend a pleading to "identify the proposed amendments through the use of a word processing red-line function or other similar markings" (quotations omitted)).   The Court would accordingly be within its discretion to simply outright deny this "cursory or boilerplate request[] . . ., made solely in a memorandum in opposition to a motion to dismiss." *Malin v. XL Capital, Ltd*., 312 F. App'x 400, 402 (2d Cir. 2009).

However, the Court cannot, on the record before it, rule out the possibility that Plaintiffs could successfully plead their claims.  Accordingly, the Court will conditionally grant Plaintiffs' request for leave to amend, contingent on Plaintiffs filing a motion that comports with the requirements of the Local Rules of Civil Procedure and that includes a viable proposed second amended complaint, within 30 days of entry of this Decision and Order as set forth below.

## **CONCLUSION**

For the foregoing reasons, the Court grants Defendants' joint motion to dismiss. (Dkt. 47). The Court further conditionally grants Plaintiffs' request for leave to file a second amended complaint, contingent on the filing by Plaintiffs of a procedurally proper motion for leave to amend that includes a viable proposed second amended complaint, within 30 days of entry of this Decision and Order. In the event such a motion is filed, the Court will enter a briefing schedule thereon. If no such motion is filed, the amended complaint (Dkt. 41) shall be dismissed with prejudice.

Defendants' motion to stay discovery pending resolution of its motion to dismiss (Dkt. 51) is denied as moot. However, in light of the Court's finding that all of Plaintiffs' claims are subject to dismissal, the Court *sua sponte* orders that no further discovery shall be conducted herein until Plaintiffs' request for leave to amend is finally resolved.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 2, 2022
     Rochester, New York