UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

MOSAIC HEALTH, INC. and CENTRAL
VIRGINIA HEALTH SERVICES, INC.,
*individually and on behalf of all those
similarly situated*,

Plaintiffs,

v.

SANOFI-AVENTIS U.S., LLC, ELI
LILLY AND COMPANY, LILLY USA,
LLC, NOVO NORDISK INC., and
ASTRAZENECA PHARMACEUTICALS
LP,

Defendants.

———————————————————————

**DECISION AND ORDER**

6:21-CV-06507 EAW CDH

## INTRODUCTION

In this putative class action, plaintiffs Mosaic Health, Inc. ("Mosaic Health") and Central Virginia Health Services, Inc. ("CVHS") (collectively "Plaintiffs") allege that defendant pharmaceutical companies Sanofi-Aventis U.S., LLC ("Sanofi"), Eli Lilly and Company and Lilly USA, LLC ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and AstraZeneca Pharmaceuticals LP ("AstraZeneca") (collectively "Defendants") have violated state and federal antitrust laws by "coordinating to retract a long-standing discount for safety-net hospitals and clinics." (Dkt. 93 at ¶ 1). Plaintiffs have also asserted claims for unjust enrichment under the laws of several states. (*Id*. at ¶¶ 388-480).

Defendants have moved for dismissal of Plaintiffs' state-law antitrust and unjust enrichment claims. (Dkt. 113). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background

The facts that follow are taken from the second amended complaint, which is the operative pleading. (Dkt. 93). Consistent with the standard on a motion to dismiss, the Court treats Plaintiffs' allegations as true.

This case involves "a special discount offered to safety-net hospitals and clinics, which purchase drugs filled by their patients at retail pharmacies." (*Id.* at ¶ 3). This discount is "known as the 340B Drug Discount," because it "is calculated by a mathematical formula codified at Section 340B of the Public Health Service Act, 42 U.S.C. § 256b." (*Id.*). For a number of years, pharmaceutical companies "offered the 340B Drug Discount to safety-net hospitals and clinics, not only for on-site use but also for purchase and distribution by retail pharmacies." (*Id.*). These retail pharmacies, which are typically called "Contract Pharmacies," have contracts with safety-net providers pursuant to which the providers "purchase drugs on their own accounts, discounted with the 340B Drug Discount, to be delivered to and dispensed by the Contract Pharmacies." (*Id.*). "Since at least 1996, and in greater volumes since 2010, all drug companies participating in the 340B Drug Discount Program have offered Contract Pharmacy 340B Drug Discounts to covered entities." (*Id.* at ¶ 57).

Plaintiffs and the members of the putative class are "safety-net hospitals and clinics" that "provide healthcare services to low-income and underserved patients[.]" (*Id.* at ¶ 5). These services are funded in significant part through savings derived from 340B Drug Discounts. (*Id.*). "The net savings and revenue generated through access to 340B Drug Discounts is sometimes referred to as 340B Savings." (*Id.* at ¶ 25).

Defendants "are four drug companies that dominate three key markets for diabetes treatments"—specifically, the "lucrative diabetes markets for: (i) rapid-acting analog insulins; (ii) long-acting analog insulins; and (iii) incretin mimetics." (*Id.* at ¶ 2). Plaintiffs contend that in the summer of 2020—following the failure of a joint lobbying effort by Defendants to limit 340B Drug Discounts with respect to diabetes medications—Defendants entered into a conspiracy to "collusively eliminat[e] or limit[] Contract Pharmacy 340B Drug Discounts for their drugs, most significantly including their drugs dominating rapid-acting analog insulin, long-acting analog insulin, and incretin mimetic sales." (*Id.* at ¶ 6).

In the second half of 2020, each of Defendants "announced novel restrictions on Contract Pharmacy 340B Drug Discounts." (*Id.* at ¶ 133). On July 24, 2020, AstraZeneca informed the Department of Health and Human Services ("HHS") by letter that beginning on October 1, 2020, it would recognize only one contract pharmacy per covered entity for covered entities without an on-site dispensing pharmacy. (*Id.* at ¶ 134). On July 27, 2020, Sanofi publicly announced that it was implementing a new initiative that "would cut off all Contract Pharmacy 340B Drug

Discounts, which had been in place for a decade, unless covered entities . . . ent[ered] into a contract to provide sensitive prescription claims data to a Sanofi vendor, Second Sight Solutions, through a software portal called 340B ESP" on what Plaintiffs contend were "commercially unreasonable terms[.]" (*Id.* at ¶ 136).

On August 19, 2020, Eli Lilly advised HHS by letter that effective September 1, 2020, it would end its practice of "honoring requests for 340B contract pharmacies for orders on all Lilly products except where, primarily, a covered entity does not have an in-house pharmacy." (*Id.* at ¶ 137) (internal quotation marks omitted). Eli Lilly "added a special exception to permit Contract Pharmacies to pass along certain insulin products at cost," but Plaintiffs assert that this "exception was infeasible for covered entities and pharmacies, as it required the Contract Pharmacies to fill prescriptions without any fee whatsoever." (*Id.* at ¶ 138).

On December 1, 2020, Novo Nordisk informed HHS that "it would stop offering Contract Pharmacy 340B Drug Discounts to hospital covered entities" effective January 1, 2021. (*Id.* at ¶ 140). Defendants "have since made minor changes to their exceptions, while maintaining their common approach of refusing to offer Contract Pharmacy 340B Drug Discounts for the overwhelming majority of potential Contract Pharmacy sales." (*Id.* at ¶ 141). Defendants' newly adopted restrictions had the "immediate impact" of ending "the overwhelming majority of Contract Pharmacy 340B Drug Discount sales to covered entities." (*Id.* at ¶ 177).

II.     **Procedural Background**

Mosaic Health commenced this matter on July 30, 2021. (Dkt. 1). CVHS was added as a plaintiff in the first amended complaint, which was filed on October 22, 2021. (Dkt. 41). Defendants filed a joint motion to dismiss the first amended complaint on November 12, 2021.  (Dkt. 47; Dkt. 48). The Court granted Defendants' motion on September 2, 2022, but afforded Plaintiffs the opportunity to file a motion for leave to amend. (Dkt. 71).

On October 3, 2022, Plaintiffs filed a motion for leave to amend. (Dkt. 72). The Court denied Plaintiffs' motion on February 1, 2024, and ordered that the Clerk of Court close the case. (Dkt. 83). Plaintiffs appealed the dismissal of the action. (Dkt. 85). The Second Circuit subsequently vacated the judgment and remanded the matter for this Court to grant Plaintiffs leave to file their second amended complaint and to re-examine its conclusions as to Plaintiffs' state-law claims. *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 85 (2d Cir. 2025). The Second Circuit's mandate issued on December 15, 2025. (Dkt. 87).

The second amended complaint was filed on December 17, 2025 (Dkt. 93),and sets forth the following claims:  (1) violations of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) "unreasonable restraint of trade" in violation of the laws of Arizona, California, Connecticut, the District of Columbia, Illinois, Florida, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin (the "Second Claim"); and

(3) unjust enrichment under the laws of Arizona, Hawaii, Illinois, Iowa, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah, Vermont, Virginia, West Virginia, and Wisconsin (the "Third Claim").  (Dkt. 93 at ¶¶ 370-480).

On remand, the Court ordered additional briefing to assist in its re-examination of Plaintiffs' state-law claims. (*See* Dkt. 88; Dkt. 105). Consistent with the Court's orders, Defendants jointly filed the instant motion to dismiss on February 17, 2026. (Dkt. 113). Plaintiffs filed a response on March 19, 2026. (Dkt. 127).

On April 8, 2026, pursuant to 28 U.S.C. § 636(c), the parties filed a stipulation consenting to the undersigned's jurisdiction to conduct any and all proceedings and enter a final order with respect to the pending motion to dismiss. (Dkt. 132). That same day, Chief United States District Judge Elizabeth A. Wolford entered an order referring the motion to dismiss to the undersigned, consistent with the parties' stipulation. (Dkt. 133).[1]

Defendants filed a reply in further support of their motion to dismiss on April 9, 2026, rendering the matter fully briefed. (Dkt. 134).

**DISCUSSION**

I.  **Legal Standard**

"In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), 'a district court may consider the facts alleged in the complaint, documents attached to the

---

[1]     This matter has also been referred to the undersigned for all non-dispositive pretrial matters. (Dkt. 107).

complaint as exhibits, and documents incorporated by reference in the complaint.'" *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 436 (2d Cir. 2024) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). The Court must proceed by "accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017).[2]

The Supreme Court has explained that an adequately pleaded complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).

---

[2]    Plaintiffs have made the procedural argument that Rule 12(g)(2) precludes Defendants from raising any arguments that they did not raise in their original Rule 12(b)(6) motion. (*See* Dkt. 127 at 19-20); *see* Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."). But Defendants' original motion to dismiss was not addressed to the Second Amended Complaint, which had not been filed at the time. (*See* Dkt. 47; Dkt. 72; Dkt. 93); *see also Fasano v. Li*, 47 F.4th 91, 105 (2d Cir. 2022) (explaining that a motion to dismiss an amended complaint is not "available" before the amended complaint is filed). This argument therefore fails.

## II.    Viability of Plaintiffs' State-Law Claims under *Astra*

In *Astra USA Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the Supreme Court considered a challenge brought by the "operator of several 340B entities" against nine pharmaceutical companies, "alleging that the companies were overcharging 340B health-care facilities in violation of the [Pharmaceutical Pricing Agreements ('PPAs')[3]] to which the companies subscribed." *Id.* at 116. The Supreme Court found that the plaintiff could not maintain its claims, explaining that "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities." *Id.* at 117. It further noted that "suits by 340B entities would undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. Instead, "the proper remedy for covered entities complaining of overcharges and other violations of the discounted pricing requirements" is to participate in an administrative "adjudicative framework" within HHS. *Id.* at 121-22.

In seeking dismissal of Plaintiffs' federal antitrust claims, Defendants argued that Plaintiffs' suit was "an impermissible attempt to enforce 340B (by dressing it up in antitrust and unjust enrichment clothing)" and thus ran afoul of *Astra*. (Dkt. 47-1 at 46-47). The Court did not reach this argument in granting Defendants' motion to dismiss or denying Plaintiffs' motion for leave to amend, because it resolved those

---

[3]    "PPAs are . . . uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS. Manufacturers' eligibility to participate in State Medicaid programs is conditioned on their entry into PPAs for covered drugs purchased by 340B entities." *Astra*, 563 U.S. at 113.

motions on other grounds. However, on appeal, the Second Circuit considered the question of whether *Astra* bars covered entities from bringing claims under the Sherman Act and concluded that it does not. *See Mosaic Health*, 156 F.4th at 78.

In so concluding, the Second Circuit held that this "case does not turn on the meaning of the Section 340B statute nor on a determination . . . as to whether Defendants violated Section 340B. Plaintiffs . . . would seek to enjoin the Defendants' alleged price-fixing independent of the district court finding that Defendants violated Section 340B." *Id*. The Second Circuit further explained that "[u]nlike the overcharge claims at issue in *Astra*, Congress did not intend for . . . HHS[] to adjudicate and enforce antitrust price-fixing claims." *Id*. at 79 (further holding that "[a]t bottom, *Astra* makes plain that Congress vested authority in HHS to oversee compliance with the Section 340B Drug Discount Program and enforce the ceiling price contracts, not to police antitrust violations").

In the present motion to dismiss, Defendants make a narrowed argument based on *Astra*, contending that the Second Circuit permitted Plaintiffs' federal antitrust claim to proceed specifically because it does not seek overcharge damages, but that the same is not true of Plaintiffs' state-law claims. (Dkt. 113-1 at 13-17). "It therefore follows," Defendants argue, "that any of Plaintiffs' claims that do seek overcharges . . . are like those at issue in *Astra* and therefore must be dismissed." (*Id*. at 15 (emphasis omitted); *see also* Dkt. 134 at 7 ("*Astra* forecloses Plaintiffs' claims because determining whether 'overcharges' occurred here depends on whether Plaintiffs were entitled to the 340B price.")). Specifically, Defendants ask the Court

to dismiss "Plaintiffs' Second Claim to the extent it seeks overcharge damages, and Plaintiffs' Third Claim (which only seeks overcharge damages) in its entirety," pursuant to *Astra*. (Dkt. 113-1 at 17 (emphasis omitted)).

Perhaps unsurprisingly, Plaintiffs read the Second Circuit's decision on appeal very differently. They contend that the Second Circuit held that Plaintiffs' "second amended complaint is 'agnostic as to the question' of whether Defendants violated Section 340B." (Dkt. 127 at 16 (alteration omitted and quoting *Mosaic Health*, 156 F.4th at 78)). Plaintiffs argue that this conclusion was not limited to their federal claims and that any finding by this Court that their state-law claims are barred by *Astra* would accordingly violate the mandate rule. (*Id.* at 16-19). Plaintiffs also argue that, in any event, their state-law claims do not require any adjudication of Section 340B and thus do not implicate *Astra*. (*See id.* at 14 ("The only overcharges that implicate *Astra* are overcharges requiring the construction of Section 340B. And the overcharges here do not. So, while Defendants are correct that the state law claims include overcharge damages, they are wrong that assessing overcharges here triggers *Astra*.") (internal citation omitted)).

The mandate rule is "a branch of the law-of-the-case doctrine that rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal." *United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024) (citations and quotations omitted), *cert. denied*, 145 S. Ct. 1071 (2025). The mandate rule requires the Court to consider "both the specific dictates of the remand order as well as the broader spirit of the mandate." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 671

F.3d 261, 270 (2d Cir. 2012) (quotation omitted). The Court has a "duty to give the mandate full effect." *In re Coudert Bros. LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (quotation omitted). However, a district court does "not violate the mandate rule by addressing on remand an issue that was not decided by [the appellate court] in the original appeal." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014); *see also New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) ("[A] mandate is controlling only as to matters within its compass. . . . Put simply, the law of the case does not extend to issues an appellate court did not address." (internal quotation marks and citations omitted)).

The Court has carefully reviewed what the Second Circuit did and did not determine with respect to *Astra* and how those rulings impact the viability of Plaintiffs' state-law claims. Initially, the Court agrees with Defendants that the Second Circuit did not expressly consider whether *Astra* bars Plaintiffs' state-law claims seeking overcharge damages. Indeed, the relevant portion of the Second Circuit's decision is entitled "*Astra* Does Not Bar Sherman Act Claims." *Mosaic Health*, 156 F.4th at 78. But that does not end the inquiry. The Court still must look to the "broader spirit" of the Second Circuit's determination and ascertain whether the Second Circuit impliedly reached any conclusions with respect to the arguments advanced by Defendants.

The Second Circuit's mandate encompasses generally applicable holdings regarding *Astra's* scope. In considering whether *Astra* barred Plaintiffs from bring a claim under the Sherman Act, the Second Circuit discussed *Astra's* background and

reasoning, explaining that "[a]t bottom, *Astra* makes plain that Congress vested authority in HHS to oversee compliance with the Section 340B Drug Discount Program and enforce the ceiling price contracts, not to police antitrust violations." *Id.* at 79. The Second Circuit further observed that Plaintiffs do not, in this case, "seek to enforce the Section 340B Drug Discount mandates nor the Pharmaceutical Pricing Agreements to compel the drug manufacturers to offer the discounted drugs at a specific Section 340B ceiling price" and that "[t]he instant case does not turn on the meaning of the Section 340B statute nor on a determination from this Court as to whether Defendants violated Section 340B." *Id*. at 78.

These holdings by the Second Circuit foreclose any finding that *Astra* bars Plaintiffs' state-law claims, which are based on the same theory as Plaintiffs' federal antitrust claim—namely, that Defendants unlawfully conspired to raise prices on their lucrative diabetes medications. The Second Circuit concluded that it was not necessary to construe Section 340B to assess the validity of such a claim and that such a claim—unlike the claims at issue in *Astra*—is not, in essence, an attempt to enforce the statute. This Court is duty-bound to accept and apply that conclusion.

Defendants' arguments to the contrary are not persuasive. Defendants focus heavily on footnote 5 of the Second Circuit's decision ("Footnote 5"), which states: "In the second amended complaint, Plaintiffs specifically limit their request for damages for the federal antitrust claim to the lost profits described herein and injunctive relief. Plaintiffs do, however, seek damages related to overcharges in connection with the subset of their state-law claims that are not governed by the limitations in *Illinois*

*Brick.*" *Id.* at 80 n.5. (internal citation omitted). What Defendants fail to adequately consider, however, is that Footnote 5 does not appear in the section of the Second Circuit's decision related to *Astra*. It instead is part of the Second Circuit's analysis of whether *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), precludes Plaintiffs' federal antitrust claim.

"In *Illinois Brick*, the Supreme Court held that indirect purchasers alleging overcharge claims do not have standing to sue for antitrust violations under the Clayton Act." *Mosaic Health*, 156 F.4th at 80 (citing *Illinois Brick*, 431 U.S. at 746). This holding was based on "concern for duplicative recoveries and the complexities of tracing overcharges through multiple levels of distribution." *Id.* The Second Circuit noted that in this case, "Plaintiffs have expressly disclaimed damages for overcharges in relation to their claims that are governed by *Illinois Brick*." *Id.* Footnote 5 is appended to this sentence, and clarifies that Plaintiffs do seek overcharge damages with respect to portions of their state-law claims.[4] The Court accordingly disagrees with Defendants that Footnote 5 was meant to draw a "sharp distinction . . . between the Sherman Act claims and the state-law claims" with respect to the impact of *Astra*. (*See* Dkt. 134 at 6). Footnote 5 must be read in the context it appears—that is, as a clarification related to the *Illinois Brick* analysis.

---

[4]    "Many states have not expressly adopted or rejected *Illinois Brick*, but they have antitrust laws that are harmonized with federal law or overwhelmingly look to federal law for guidance. Therefore, any state that has not expressly passed *Illinois Brick* repealer legislation or interpreted its law in such a way as to override the rule of *Illinois Brick* is presumed to have decided to follow federal law, including the *Illinois Brick* limitation on indirect purchaser claims." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) (quotation and citation omitted).

- 13 -

The Court further is not persuaded that the use of the word "overcharges" in connection with Plaintiffs' state-law claims is dispositive. The Second Circuit's decision on appeal does not hold that every claim that could described as seeking an "overcharge" is categorically barred by *Astra*. Instead, the Second Circuit was clear that the claims that covered entities may not pursue are those akin to "the overcharge claims <u>at issue in *Astra*</u>." *Mosaic Health*, 156 F.4th at 79 (emphasis added). The overcharge claims at issue in *Astra* specifically relied on a factual finding that the defendant pharmaceutical companies have violated the Section 340B mandates and had charged prices in excess of those permitted by law and the PPAs. *See Astra*, 563 U.S. at 116 (explaining that the covered entities "commenced suit against Astra and eight other pharmaceutical companies, alleging that the companies were overcharging 340B health-care facilities in violation of the PPAs to which the companies subscribed"). As explained above, the Second Circuit concluded in its analysis of Plaintiffs' federal antitrust claim that this case does not call for a factual determination of whether Defendants violated Section 340B. *Mosaic Health*, 156 F.4th at 78. This Court is not free to now conclude to the contrary.

In their reply, Defendants argue that *Astra* does not "apply exclusively in cases about violations of the discounted pricing requirements of Section 340B." (Dkt. 134 at 8 (quotation omitted)). But that is the logical implication of what the Second Circuit concluded on appeal in this matter. Defendants' arguments to the contrary prove too much. Defendants contend that Plaintiffs' state-law claims would "undermine HHS's efforts to administer both Medicaid and § 340B harmoniously and on a uniform,

nationwide basis" and "alter the bargain Congress struck with manufacturers as part of the 340B Program." (*Id.* (quotation and alteration omitted)). Whatever force those arguments may have, they apply equally to Plaintiffs' federal antitrust claim and were nonetheless rejected by the Second Circuit. This Court's duty to give the Second Circuit's mandate full effect and to apply its broader spirit dictates the Court's resolution of these arguments.

The Second Circuit indicated that *Astra* bars a covered entity's claim where the claim "turn[s] on the meaning of the Section 340B statute []or on a determination . . . as to whether Defendants violated Section 340B." *Mosaic Health*, 156 F.4th at 78. The "overcharge" damages that Plaintiffs seek in connection with their state-law claims do not fall within this class of claims, because—as the Second Circuit determined—it is not necessary to find that Plaintiffs were entitled to the Section 340B price to use that price as the starting point for the status quo. Accordingly, the Court will not dismiss Plaintiffs' state-law claims as precluded by *Astra*. The Court therefore turns to Defendants' further arguments in support of dismissal.

## III.   **Plaintiffs' State-Law Antitrust Claims**

Defendants argue that Plaintiffs' state-law antitrust claims fail because Plaintiffs have not "allege[d] a plausible violation of any applicable state law." (Dkt. 113-1 at 17). Defendants contend that Plaintiffs have failed to address the "unique requirements of each state's statute," and have instead "resort[ed] to generic, one-size-fits-all allegations that offer nothing more than boilerplate assertions that the

supposed conspiracy affected commerce within each of the States." (*Id.* (quotation omitted)).

More particularly, Defendants argue that: (1) Plaintiffs have not stated a claim under New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, because they have failed to sufficiently allege intrastate affects; (2) because they have not stated a claim under the Donnelly Act, Plaintiffs lack standing to pursue antitrust claims under the laws of any other state; (3) Plaintiffs have failed to allege sufficient intrastate conduct or effects under the laws of Arizona, California, Connecticut, the District of Columbia, Illinois, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin; and (4) Plaintiffs cannot state a claim under Utah's antitrust statute because there is no named plaintiff from Utah. (*Id.* at 18-25). For the reasons that follow, the Court concludes that Plaintiffs have failed to state antitrust claims under the laws of Mississippi and Utah, but that their state-law antitrust claims are otherwise adequately pleaded.

The Court turns first to the requirements of New York's Donnelly Act. "Under the Donnelly Act, any contract, agreement, or arrangement that forms a monopoly or restrains competition in trade is illegal." *Own Your Hunger LLC v. Linus Tech., Inc.*, No. 25-cv-4544, 2025 WL 1693466, at *3 (S.D.N.Y. June 17, 2025); *see* N.Y. Gen. Bus. Law § 340(1). To state a Donnelly Act claim, "a plaintiff must (1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market

- 16 -

in question, and (4) show a conspiracy or reciprocal relationship between two or more entities." *Barbato v. Interstate Fire & Cas. Co.*, No. 25-CV-5312 (JGK), 2026 WL 1362183, at *4 (S.D.N.Y. May 15, 2026) (quotation omitted).

The Donnelly Act does not apply "[w]here the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce[.]" *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, No. 03 CIV. 5889 (DAB), 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005) (quoting *Two Queens, Inc. v. Scoza*, 296 A.D.2d 302, 304 (1st Dep't 2002)); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) ("New York requires an impact on intrastate commerce so as to avoid a dormant Commerce Clause issue."). But at the pleading stage, the Donnelly Act's requirements may be satisfied "where a New York-based Plaintiff has alleged harm to itself specifically." *Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2020 WL 6273477, at *7 (N.D. Ill. Oct. 26, 2020).

Defendants contend that the Second Amended Complaint "alleges no New York conduct by Defendants, and its only allegation of New York impact is the same generic assertion made for every state: that covered entities 'reside within each of the above-listed States' and therefore 'paid inflated prices there.'" (Dkt. 134 at 10 (alteration omitted and quoting Dkt. 93 at ¶¶ 386-87)). But this understates the relevant allegations in the Second Amended Complaint. The Second Amended Complaint states that Mosaic Health has its principal place of business in New York and has operated 24 safety-net clinics. (Dkt. 93 at ¶ 11). It further alleges that as of September 30, 2022, more than 2,900 contract pharmacies in New York State had

registered contract pharmacy arrangements with covered entities. (*Id*. at ¶ 62). The Second Amended Complaint also alleges that Defendants "transact and do business within the State of New York, contract to supply goods and services within the State of New York, regularly solicit business and derive substantial revenue from drugs sold in the State of New York[.]" (*Id*. at ¶ 19).

These allegations are similar to allegations that courts have found sufficient to establish intrastate effects for purposes of the Donnelly Act. *See, e.g., In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F. Supp. 3d 624, 649-50 (M.D.N.C. 2025) (finding Donnelly Act claim adequately pleaded where plaintiffs alleged that "(1) Plaintiffs or class members purchased [products] in New York, (2) Defendants established or maintained a monopoly in New York for [those products] and (3) Plaintiffs or class members were injured in New York"); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 890 (E.D. Mich. 2014) ("The allegations advanced by IPPs differ from those found lacking and insufficient under New York law because IPPs have alleged that they paid artificially high prices in New York."); *In re Digital Music*, 812 F. Supp. 2d at 217 (finding complaint alleged a "significant impact on intrastate commerce in New York" where "the end purchasers presumably purchased Internet Music from New York and consumed the product in New York" and many of the defendants were headquartered in New York and "clearly conduct[ed] significant business in New York." (internal quotation marks omitted)); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 664 (E.D. Mich. 2011) ("The ACAC sets forth facts sufficient at the pleading stage, identifying the state of New York as well as the

effect on competition in each of the named Plaintiffs' states, to allege the requisite intrastate effects under the Donnelly Act."). The Court finds that the Second Amended Complaint adequately alleges intrastate effects in New York as required to state a Donnelly Act claim.

Having reached this conclusion, Defendants' standing argument as to the other state-law antitrust claims also fails. Defendants recognize that their standing argument depends on dismissal of Plaintiffs' Donnelly Act claim. (*See* Dkt. 113-1 at 20; Dkt. 134 at 10-11); *see Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018) ("[A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), . . . not a question of adjudicatory competence under Article III." (internal quotation marks omitted)).

The Court accordingly moves to Defendants' argument that Plaintiffs have failed to allege sufficient intrastate conduct or effects under the laws of Arizona, California, Connecticut, the District of Columbia, Illinois, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin. The Court is unpersuaded by this argument to the extent that the laws of these states require allegations of intrastate effects. Courts considering similar arguments have concluded that plaintiffs "sufficiently ple[a]d intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each

state." *Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 548 (D. Vt. 2024) (quotation omitted); *see also In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019) ("This Court joins the majority of courts in concluding that the EPPs have sufficiently pled intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each state."); *In re Digital Music*, 812 F. Supp. 2d at 408 ("[T]he Court must construe the pleadings in a light favorable to Plaintiffs and thus considers allegations of nationwide sales and distribution on essentially the same terms in both intrastate and interstate commerce to be sufficient.").

Plaintiffs allege that the purported conspiracy has impacted "more than 4,000 covered entities" and that "[c]overed entities in the 340B Program with Contract Pharmacy arrangements in place reside within each of the [relevant] States and were denied or limited in receiving Contract Pharmacy 340B Drug Discounts from Defendants." (Dkt. 93 at ¶¶ 62, 387). This case is accordingly unlike *Miami Products & Chemical Co. v. Olin Corp.*, 546 F. Supp. 3d 223 (W.D.N.Y. 2021).[5] In *Miami Products*, the alleged price-fixing conspiracy involved a "commodity chemical" with only "hundreds of purchasers." *Id.* at 244. The court's decision in *Miami Products*

---

[5]     The other case on which Defendants primarily rely, *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, No. 1:14-MD-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015), has been distinguished by other courts. *See, e.g. In re Copaxone Antitrust Litig.*, No. 2:22-CV-1232 (JXN/JSA), 2025 WL 2771874, at *14 (D.N.J. Aug. 7, 2025); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 763 (W.D. Tenn. 2022); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 837 n.99 (E.D. Pa. 2019). In any event, this Court is not bound by an unpublished, out-of-Circuit district court decision.

turned on the fact that it was "not a case involving a high-volume consumer good with many thousands of purchasers, such that a factfinder could reasonably assume that sales had been made in every state." *Id*. [6] By contrast, the goods at issue here are widely used diabetes medications, and the Second Amended Complaint expressly alleges that the members of the putative class were harmed in each of the relevant states. (Dkt. 93 at ¶ 387). This is sufficient to plausibly allege intrastate effects at the pleading stage. *In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, No. CV2112061ZNQTJB, 2023 WL 2182046, at *4 (D.N.J. Feb. 23, 2023) (noting that "[w]hether [the plaintiffs] will ultimately establish facts sufficient to prove each of their state antitrust claims is a question . . . to be addressed later in this litigation").

Defendants further argue that the laws of Arizona, Connecticut, Michigan, Minnesota, Mississippi, Nebraska, and Nevada require not just intrastate effects, but specifically intrastate conduct by Defendants, and that the Second Amended Complaint fails to meet this standard. (Dkt. 134 at 12). The Court rejects this argument, except as to the law of Mississippi.

Turning first to Arizona law, Arizona's antitrust statute prohibits "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state[.]" Ariz. Rev. Stat. § 44-1402. Defendants seem to suggest that the language "in this state" means

---

[6]    The court in *Miami Products* in fact denied the defendants' motion to dismiss under the antitrust laws of Kansas, Nevada, and Tennessee because the plaintiffs had "specifically alleged that one or more Defendants made sales of [the chemical product at issue] therein." 546 F. Supp. 3d at 243.

that some part of the conspiracy must have occurred in Arizona. (*See* Dkt. 113-1 at 22; Dkt. 134 at 12). But that is not how courts have interpreted Arizona's statute. *See, e.g., Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 762 (W.D. Tenn. 2022) ("The antitrust laws of Arizona, Mississippi, South Dakota, and West Virginia do all require a measure of intrastate <u>effect</u> within that jurisdiction. Alabama's antitrust laws, by contrast, regulate only intrastate <u>conduct</u>." (emphasis in original)); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425, at *15 (E.D. Pa. Aug. 3, 2007) (stating that Arizona's antitrust law "require[s] that at least some part of the alleged <u>injury</u> have occurred within the state and have affected consumers within the state" (emphasis added)). Defendants have cited no cases interpreting Arizona's statute in the manner they suggest, nor does the Court find such interpretation required by the statute's plain language. The phrase "within this state" is naturally read to modify the immediately preceding phrase "trade or commerce," and thus to require only that some portion of the affected trade or commerce have occurred within Arizona.

As to Connecticut, its antitrust statute "applies to every . . . restraint of any part of trade or commerce . . . when any part thereof was entered into or effectuated in whole or in part in this state." Conn. Gen. Stat. § 35-30. The language "or effectuated in whole or in part" is sufficiently broad to support application where the effects of an antitrust conspiracy occur in Connecticut. The sole case cited by Defendants, *Fido's Fences v. Canine Fence Co.*, 672 F. Supp. 2d 303 (E.D.N.Y. 2009), is inapposite. There, the court concluded that there was a "lack of any connection"

between the plaintiff's business and Connecticut. *Id*. at 313. Here, the putative class includes covered entities based in Connecticut.

Michigan's antitrust statute provides that "[t]he establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful." Mich. Comp. Laws § 445.773. Michigan law defines "relevant market" as "the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state." *Id*. at § 445.771(b). Defendants cite no case law interpreting this statute to require intrastate conduct as opposed to intrastate effects. Courts have held that allegations that individuals in Michigan "paid a higher price are sufficient to show that activities related to the alleged monopoly took place within the state." *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline*, PLC, 737 F. Supp. 2d 380, 396 (E.D. Pa. 2010); *see also Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, No. 24-CV-03567-NW, 2026 WL 1224122, at *4 (N.D. Cal. May 5, 2026) (concluding that "allegations of nationwide antitrust violations generally satisfy the intrastate statutory requirement" under Michigan law).

The Minnesota antitrust statute also does not require intrastate conduct by the defendant. It prohibits: "(a) any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in this state; and (b) any contract, combination, or conspiracy, wherever created, formed, or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish,

maintain, or use monopoly power; whenever any of the foregoing affects the trade or commerce of this state." Minn. Stat. § 325D.54. Notably, Defendants quote only subsection (a) of this statute in their moving papers. (*See* Dkt. 113-1 at 23). They do not discuss or even acknowledge subsection (b), which expressly applies to "any contract, combination, or conspiracy, wherever created, formed, or entered into" that "affects the trade or commerce of" Minnesota. Defendants' argument regarding Minnesota law accordingly lacks merit.

Nebraska's antitrust statute provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal." Neb. Rev. Stat. § 59-801. The Supreme Court of Nebraska has held that this statute applies where the alleged conduct "affected end users of . . . equipment in Nebraska by denying them the advantage of parts sold in a freely competitive market." *Heath Consultants, Inc. v. Precision Instruments, Inc.*, 247 Neb. 267, 281 (1995). Defendants' cited authority does not call into question this interpretation by Nebraska's highest court. To the contrary, the case that Defendants cite, *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, 285 Neb. 526 (2013), addresses a different provision of Nebraska law, Nev. Rev. Stat. § 59-805. *Credit Bureau*, 285 Neb. at 530-31 ("[W]e note that § 59-805 is unusual among state statutes and there is no federal equivalent statute. Compare: § 59-801 equates to Sherman Act § 1 (restraint of trade), and § 59-802 equates to Sherman Act § 2 (antimonopoly).").

And as to Nevada, its antitrust statute provides: "Every activity enumerated in this subsection constitutes a contract, combination or conspiracy in restraint of trade, and it is unlawful to conduct any part of any such activity in this State[.]" Nev. Rev. Stat. § 598A.060(1). At least one federal court has expressly rejected the argument that this statute "requires that the allegedly anticompetitive conduct have taken place, in part, within Nevada." *Sheet Metal Workers*, 737 F. Supp. 2d at 397 (further finding "Nevada requires only that the plaintiffs show that some part of the prohibited activity caused harm in Nevada"). Defendants have cited no contrary authority and have offered no argument for why the statute should be read in the manner they suggest. They have accordingly failed to demonstrate that dismissal of the Nevada antitrust claim is warranted.

But the Court does find that the Mississippi Antitrust Act (Miss. Code Ann. § 75-21-1) requires something more than is alleged in the Second Amended Complaint. The Supreme Court of Mississippi has held that "a material element" of a claim under this statute "is that the illegal objective . . . be accomplished in part at least by transactions lying wholly within the state." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020) (quotation omitted); *see also In re Visa Debit Card Antitrust Litig.*, No. 24-CV-7435 (JGK), 2025 WL 3019893, at *7 (S.D.N.Y. Oct. 28, 2025) (dismissing claims under Mississippi Antitrust Act because the complaint contained "no allegations of wholly intrastate transactions" (emphasis omitted)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266 (S.D.N.Y. 2019) ("[T]he antitrust law of Mississippi focuses on the

location where the anticompetitive conduct occurred rather than the effects of such anticompetitive conduct or the broader nexus between the conduct and the state in question."). Plaintiffs' Second Amended Complaint does not specifically allege any wholly intrastate transactions within Mississippi. Plaintiffs have also failed to address this requirement of Mississippi law or explain how it is satisfied here. Accordingly, Plaintiffs' Second Claim must be dismissed to the extent it alleges a violation of the Mississippi Antitrust Act.

The Court further agrees with Defendants that Plaintiffs cannot maintain a claim under the Utah Antitrust Act, Utah Code Ann. §§ 76-16-501, *et seq.*, because "to state a claim under the [Utah Antitrust Act], there must be a named plaintiff who is a Utah citizen or resident." *Miami Prods.*, 546 F. Supp. 2d at 247. The Court is unpersuaded by Plaintiffs' argument that "this issue is premature at this initial stage" because the Court has set August 30, 2027, as the deadline for motions to join parties or amend the pleadings. (Dkt. 127 at 27; *see* Dkt. 126 at ¶ 5). As the court explained in *Miami Products*, "the plain language of the [Utah Antitrust Act] states that a Utah citizen or resident must bring the action[.]" 546 F. Supp. 2d at 247 (quotation omitted).[7] While there may be practical benefits to delaying this inquiry to the class certification stage (*see* Dkt. 127 at 27), practical benefits cannot outweigh clear statutory language.

---

[7] Utah's antitrust laws were renumbered effective May 7, 2025. However, the relevant renumbered statutory provision, Utah Code Ann. § 76-16-511(1)(a)(i), continues to provide that only "[a] person who is a citizen of this state or a resident of this state" may "bring" an action for injunctive relief and damages.

- 26 -

For these reasons, the Court grants Defendants' motion to dismiss Plaintiffs' Second Claim to the extent it alleges violations of the Mississippi Antitrust Act and the Utah Antitrust Act. Defendants' request for dismissal of the Second Claim is otherwise denied.

## IV.   **Plaintiffs' State-Law Unjust Enrichment Claims**

The Court turns finally to Defendants' remaining challenges to Plaintiffs' state-law unjust enrichment claims. Defendants argue that: (1) Plaintiffs have failed to state an unjust enrichment claim under the laws of either New York or Virginia; (2) because Plaintiffs do not have a viable unjust enrichment claim under either New York law or Virginia law, they "lack standing to bring unjust enrichment claims on behalf of unnamed putative class members in any other state"; and (3) Plaintiffs have failed to specifically satisfy the requirements of Michigan and Mississippi law regarding unjust enrichment. (Dkt. 113-1 at 25-27).

Defendants argue that Plaintiffs cannot maintain a Virginia unjust enrichment claim because "Plaintiffs cannot seek 'overcharge' damages as indirect purchasers under Virginia law." (Dkt. 113-1 at 25). Defendants' argument turns on Virginia's status as a state that has not repealed *Illinois Brick*. Plaintiffs acknowledge that Virginia "has not enacted an *Illinois Brick* repealer statute," but argue that "*Illinois Brick* does not displace state unjust enrichment claims, which exist precisely to provide equitable remedies when no adequate remedy exists at law." (Dkt. 127 at 28).

- 27 -

Many courts considering this issue have found that "[a]llowing indirect purchasers to recover and recoup a benefit . . . under an unjust enrichment theory would circumvent the policy choice of *Illinois Brick*." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010); *see, e.g., Blue Cross & Blue Shield of Vermont*, 712 F. Supp. 3d at 561 (dismissing unjust enrichment claim "insofar as it is brought under the laws of jurisdictions that apply *Illinois Brick*"); *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-CV-6549CMRWL, 2021 WL 2403727, at *35 (S.D.N.Y. June 11, 2021) ("As many courts (including this one) have held, [indirect purchasers] cannot bring unjust-enrichment claims in states that do not explicitly permit indirect-purchasers to bring suit, as permitting them to do so would constitute an impermissible end run around the *Illinois Brick* prohibition on indirect purchaser actions." (quotation omitted)); *In re Digital Music*, 812 F. Supp. 2d at 412 ("it is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by *Illinois Brick*").

There are some cases to the contrary. *See, e.g., In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 850 (E.D. Pa. 2019); *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008). But "the vast majority of courts have held that indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust . . . statute[]." *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, No. 20-1076-CFC, 2022 WL 2438934, at *23 (D. Del. July 5, 2022) (collecting cases). The Court agrees with the majority view that "it would be inequitable to

permit relief where the state has clearly made a policy determination that no such relief should lie." *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088-89 (S.D. Cal. 2017); *see also In re Novartis & Par Antitrust Litig.*, No. 18 CIV. 11835, 2019 WL 3841711, at *6 (S.D.N.Y. Aug. 15, 2019) (explaining that the contrary case law is "unpersuasive" because *Illinois Brick's* "concern for double recovery and the apportionment of claims remains" in the unjust enrichment context). The Court therefore grants Defendants' motion to dismiss Plaintiffs' Third Claim to the extent it is asserted under Virginia law.

With respect to Plaintiffs' New York unjust enrichment claim, Defendants argue that this claim fails because it is merely duplicative of Plaintiffs' other causes of action. (Dkt. 113-1 at 26). Plaintiffs argue in response that they should be permitted to be plead this claim in the alternative. (Dkt. 127 at 29). Plaintiffs also argue that their "unjust enrichment claim is separate and distinct from their New York state law antitrust claim" and that "the unjust enrichment claim is based on conduct that also violates New York antitrust laws." (*Id.*). They do no further elaborate on this argument.

"[T]he question of whether an unjust-enrichment claim is duplicative is a state-law issue," and requires a "case-by-case examination of whether each state's antitrust . . . statute has overriden or limited the scope of restitutionary relief that would normally be available to a plaintiff at equity." *In re Namenda*, 2021 WL 2403727, at *38) (quotation and alterations omitted). In New York, "an unjust-enrichment claim 'is an equitable claim that is unavailable where an adequate remedy at law exists.'"

*Id.* (quoting *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010)). "Courts in the Second Circuit have recognized that 'an unjust enrichment claim cannot survive where it simply duplicates, or replaces, a conventional contract or tort claim.'" *Alce v. Wise Foods, Inc.*, No. 17 CIV. 2402 (NRB), 2018 WL 1737750, at *11 (S.D.N.Y. Mar. 27, 2018) (quoting *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015)).

The New York Court of Appeals has explained that "unjust enrichment . . . is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). As such, "a plaintiff may plead unjust enrichment in the alternative, but where an unjust enrichment claim is duplicative of other causes of action, it should be dismissed." *Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454, 466 (S.D.N.Y. 2019); *see also Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 45 (S.D.N.Y. 2023) ("Plaintiffs are correct that unjust enrichment may be pleaded in the alternative; however, it is equally true that, even pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action." (quotation omitted)).

Plaintiffs' cursory arguments to the contrary notwithstanding, their New York unjust enrichment claim is entirely duplicative of their New York antitrust claim. It is predicated on the same conduct and seeks overcharge damages that are also sought

in connection with the New York antitrust claim. (*See* Dkt. 93 at ¶¶ 389-90). Plaintiffs have offered no meaningful explanation for how their New York unjust enrichment claim is not duplicative of their New York antitrust claim. For example, they have not articulated a theory by which they would be entitled to recover their claimed "overcharge" damages separate from the alleged price-fixing conspiracy.

Plaintiffs' New York unjust enrichment claim "will rise and fall with its statutory claims. To the extent that those claims succeed, [the unjust enrichment claim is] duplicative, and to the extent they are deficient, [the] unjust enrichment claim[] will not remediate them." *In re Novartis & Par.*, 2019 WL 3841711, at \*7; *see also In re Namenda*, 2021 WL 2403727, at \*38; *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 480 n.12 (S.D.N.Y. 2016) ("Where, as here, the unjust enrichment claim amounts to little more than a recasting of the . . . antitrust claims, plaintiffs fail to state a claim of unjust enrichment." (quotation omitted)). Dismissal of this claim is accordingly warranted.

Defendants next argue that because Plaintiffs cannot successfully "bring unjust enrichment claims under the laws of their respective states (New York and Virginia), they may not bring unjust enrichment claims under the laws of other states on behalf of a putative class." (Dkt. 113-1 at 27). Plaintiffs have not responded to this argument other than to argue that the Second Amended Complaint "sufficiently alleges unjust enrichment claims in New York and Virginia—indeed, either would suffice[.]" (Dkt. 127 at 30).

Plaintiffs have not contested that their ability to maintain the Third Claim is contingent upon their having stated a valid unjust enrichment claim under the law of either New York or Virginia. They have accordingly conceded the issue. *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue.") (quoting *Kao v. Brit. Airways, PLC*, No. 17-CV-0232 (LGS), 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018)), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022); *see also Napoli v. Nat'l Sur. Corp.*, No. 21CV9279JSRRWL, 2022 WL 1943776, at *6 (S.D.N.Y. May 19, 2022) ("Plaintiffs did not address that argument in their opposition, and, on that basis alone, may be deemed to have conceded the point."), *adopted*, 2022 WL 2110606 (S.D.N.Y. June 10, 2022), *aff'd*, No. 22-1516, 2023 WL 2320332 (2d Cir. Mar. 2, 2023); *Canas v. Whitaker*, No. 6:19-CV-06031, 2019 WL 2287789, at *6 (W.D.N.Y. May 29, 2019) ("It is well settled in this Circuit that a plaintiff effectively concedes a defendant's arguments by his failure to respond to them") (quotation and alteration omitted). As such, having concluded that Plaintiffs' Virginia and New York unjust enrichment claims are subject to dismissal, the Court grants Defendants' motion to dismiss with respect to Plaintiffs' Third Claim in its entirety.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' state-law claims (Dkt. 113) is granted in part and denied in part. Specifically, Defendants' motion is granted with respect to Plaintiffs' Third Claim in its entirety and with

respect to Plaintiffs' Second Claim to the extent it alleges a violation of the Mississippi Antitrust Act and the Utah Antitrust Act. Defendants' motion is otherwise denied with respect to Plaintiffs' Second Claim.

     SO ORDERED.

_____
COLLEEN D. HOLLAND
United States Magistrate Judge


Dated: June 26, 2026
    Rochester, New York